UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB et al.,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY et al.,<br><br>　　Defendants. | Civil Action No. 23-1744 (JDB) |

## MEMORANDUM OPINION AND ORDER

This case concluded in July 2024 with a consent decree enforcing the Clean Air Act's requirements. The consent decree required the Environmental Protection Agency ("EPA") to take certain steps on a prescribed timeline, with accommodation for extensions upon a showing of "good cause." The EPA has thus far met its obligations under the consent decree but asks for extensions to complete some upcoming obligations. Because the EPA has shown good cause for the modest extensions it requests, the Court grants the motion.

### Background

The Clean Air Act's pursuit of cleaner air is a joint federal-state venture. "The states are responsible in the first instance" for designing plans to meet the Act's goals. See Nat. Res. Def. Council, Inc. v. Browner, 57 F.3d 1122, 1123 (D.C. Cir. 1995). Once they do, the EPA "must review each submission for completeness" within a certain statutorily-imposed time period. Id. (citing 42 U.S.C. § 7410(k)(1)(B)). A submission's completion starts a twelve-month clock within which the EPA must "determine whether the plan meets the substantive requirements of the Act." Id. (citing 42 U.S.C. § 7410(k)(2)).

1

This case concerns the EPA's delayed approval of certain revised state plans aimed at satisfying the Act's goal of reducing air pollution in national parks and wilderness areas. See 42 U.S.C. § 7491(a)(1). Under an EPA regulation, the first iterations of these plans were due in 2007. See 40 C.F.R. § 51.308(b). Those plans would remain in effect until revised, and proposed revisions from the states were due July 31, 2021. See id. § 51.308(f). By statute, the EPA was required to approve or disapprove the proposed revisions within 18 months. See 42 U.S.C. § 7410(k)(1)(B) (giving the EPA six months to deem a plan revision complete); id. § 7410(k)(2), (3) (giving the EPA twelve additional months to make a final determination about a complete plan revision). The approval process is involved: it requires (1) evaluating the state's proposal against the Act's requirements and implementing regulations; (2) drafting notices of proposed and final rulemakings; (3) considering and responding to public comments; and (4) drafting rules to incorporate an approved plan into federal law—all of which often involves coordinating across EPA regional branches. See Decl. of Denisse D. Díaz Supp. Defs.' Mot. to Extend Time [ECF No. 62-1] ("Díaz Decl.") ¶¶ 8, 14.

According to the plaintiffs, the EPA failed to meet its 18-month deadline as to 34 states' proposed revisions. The deadlines, they say, expired at various times between late 2022 and mid-2023, with most due dates around August 2023. See Am. Compl. [ECF No. 15] ¶¶ 14–115.[1] The plaintiffs filed the operative complaint in November 2023, asking this Court to order the EPA to take final action on the outstanding state plans by late December 2024. See id. at pp. 25–26; Mot. Summ. J. [ECF No. 22] ("Mot. Summ. J.") at MOT-3.

---

[1] Some of these deadlines are more than 18 months after July 2021; that 18-month timeframe ran in January 2023. The delay appears to have resulted from some states' tardy submissions, which continued to arrive through August 2022. See Pls.' Mem. of P. & A. Summ. J. [ECF No. 22] ("Mem. Supp. Mot. Summ. J.") at 11–13.

2

The subsequent summary judgment briefing was cut short by the parties' successful negotiations. Following a three-month stay by consent, see Min. Order of March 29, 2024, the parties proposed, and the Court entered, a consent decree in mid-July 2024, see Order [ECF No. 53]; Consent Decree [ECF No. 53-1].

The consent decree requires the EPA to take certain statutorily required actions on a staggered schedule between late July 2024 and late December 2026. See Consent Decree at 6–8. Although the consent decree implements a schedule, however, it also contemplates the possibility of future adjustments, providing that its deadlines "may be extended" for "good cause shown pursuant to the Federal Rules of Civil Procedure." Consent Decree ¶ 7.[2]

Fourteen of the consent decree's deadlines have passed, and the EPA has complied with each. See Defs.' Combined Mot. to Extend Certain Deadlines Under Consent Decree & Statement of P. & A. [ECF No. 62] ("Mot.") at 1; Consent Decree at 6–7. But certain impending deadlines are now proving difficult for the EPA, and it moved this Court in late February 2025 for extensions. See Mot. In particular, the EPA seeks 60- or 90-day extensions for three deadlines set to expire at the end of March 2025 (final determinations regarding plans from Florida, West Virginia, and Ohio), and four deadlines set to expire at the end of May 2025 (final determinations regarding plans from Idaho, Michigan, Texas, and California). Mot. at 2.

---

[2] In full, the paragraph on modifications reads:

> The deadlines established by this Consent Decree may be extended (a) by written stipulation of Plaintiffs and EPA with notice to the Court, or (b) by the Court upon motion of any party to this Consent Decree for good cause shown pursuant to the Federal Rules of Civil Procedure and upon consideration of any response by the non-moving party and any reply. Any other provision of this Consent Decree also may be modified by the Court following the filing of a motion by an undersigned party for good cause shown pursuant to the Federal Rules of Civil Procedure and upon consideration of any response by a non-moving party and any reply.

Id.

3

The EPA points to two sorts of justifications for the request. The first is a general justification relating to personnel changes that impact each deadline equally: the arrival of a new presidential administration on January 20, 2025, the appointment of a new EPA Administrator on January 30, 2025, and the likely installation of new administrators in the EPA's various regional offices—which are directly responsible for the review of state plans—in the near future. See Mot. at 4. The EPA explains that the new administration and its officials need to be briefed and familiarized with the "highly technical" state plans before moving forward. Id.

The second sort of justification is based on delays in the more technical aspects of reviewing each state's plan. The reasons for delay vary by state—and are supported by declarations from the relevant officials in each EPA regional office—but they fall into some basic categories. Generally, the EPA highlights the volume of the states' submissions (most totaling thousands of pages each); extensive public comments; some states' promised (but as-yet unprovided) plan supplements; and limited staff stretched among various priorities. See Mot. at 4–11.

Some delays result from a combination of the two. Take Idaho as an example. After reviewing Idaho's thousand-plus page plan, the EPA completed and signed a notice of proposed rulemaking on January 6, 2025. See Decl. Krishna Viswanathan [ECF No. 62-2] ("Viswanathan Decl.") at 9. But the Federal Register—over whose publication timeline the EPA has no control—had not published the rulemaking by January 20, when President Trump ordered all agencies to "[i]mmediately withdraw any rules that have been sent to the [Office of the Federal Register] but not published in the Federal Register, so that they can be reviewed and approved" by new appointees. See The White House, Regulatory Freeze Pending Review (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/regulatory-freeze-pending-review/. As

4

a result, the rulemaking was withdrawn. Viswanathan Decl. at 9–10. The new administrator of the EPA region encompassing Idaho began duties on or around February 24, 2025, and needed to be brought up to speed on this as well as many other competing priorities. Id. at 10. The ensuing delay has set back the EPA's processing of Idaho's plan, and for that reason (in addition to other, more quotidian delays) the EPA requests a 90-day extension from May 30 to August 28. Mot. at 8–9.

In all, the EPA requests the following extensions: a 60-day extension from March 31, 2025 to May 30, 2025 to sign the Florida Regional Haze Plan revision; a 90-day extension from March 30, 2025 to June 28, 2025 to sign the West Virginia Regional Haze Plan revision; a 90-day extension from March 30, 2025 to June 28, 2025 to sign the Ohio Regional Haze Plan revision; a 90-day extension from May 30, 2025 to August 28, 2025 to sign the Idaho Regional Haze Plan revision; a 90-day extension from May 30, 2025 to August 28, 2025 to sign the Michigan Regional Haze Plan revision; a 90-day extension from May 30, 2025 to August 28, 2025 to sign the Texas Regional Haze Plan revision; and a 90-day extension from May 31, 2025 to August 29, 2025 to sign the California Regional Haze Plan revision. See Mot. at 2.

**Analysis**

The dispute over the requested extensions is really one about the standard the Court should apply. The parties offer different standards—the plaintiffs point to Rule 60(b)'s stringent standard, and the EPA points to the consent decree's more lenient "good cause" standard. And neither party attempts to meet the other's: the plaintiffs do not contest that the EPA has shown good cause, and the EPA does not contend that it has met Rule 60(b). The EPA has the right standard and the right outcome.

5

### I.     The Consent Decree's deadlines are modifiable upon a showing of "good cause."

The plaintiffs brief their opposition purely as a Rule 60(b) issue, as if the EPA seeks relief from a traditional "final judgment."  See Pls.' Opp'n to Mot. [ECF No. 65] ("Opp'n") at 4–6; Fed. R. Civ. P. 60(b).  This standard, which the EPA does not attempt to satisfy, is quite demanding. And the plaintiffs are right that it would normally apply.  Where a consent decree does not explicitly provide otherwise, the Rule 60(b) "relief from final judgment" standard indeed governs attempts to modify a consent decree.  See NLRB v. Harris Teeter Supermarkets, 215 F.3d 32, 34–35 (D.C. Cir. 2000).  After all, consent decrees are in some sense final judgments.  Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 519 (1986).

But consent decrees are not pure judgments.  They result from the "mutual agreement of the parties" rather than from adjudication and are thus "hybrid" creatures of contract and judgment, Local No. 93, 478 U.S. at 519, "generally construed according to the basic principles of contract law," Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 286 (D.C. Cir. 1993); see also, e.g., Segar v. Mukasey, 508 F.3d 16, 21 (D.C. Cir. 2007).  Under contract law, honoring "the parties' bargain resolving their case" requires honoring the terms of the contract.  Pigford v. Vilsack, 777 F.3d 509, 514 (D.C. Cir. 2015).  So if the consent decree provides for modification on terms other than those Rule 60(b) prescribes, those terms—not the rule's—govern.

This consent decree permits deadline extensions upon "good cause shown pursuant to the Federal Rules of Civil Procedure."  See Consent Decree ¶ 7.  The provision is less than pellucid. At first glance, it seems obviously to supplant Rule 60(b), as "good cause" is a significantly less demanding standard than Rule 60(b)'s—indeed one that "frees a court from the restraints of Rule 60(b)."  Gilmore v. Palestinian Interim Self-Gov't Auth., 843 F.3d 958, 966 (D.C. Cir. 2016)

(cleaned up).[3]  At the same time, absent the mention of "good cause," the reference to the Federal Rules of Civil Procedure might most naturally be read to incorporate Rule 60(b), which generally governs requests to modify judgments.

But the "good cause" language, which unambiguously prescribes a substantive standard, would make no sense paired with an incorporation of Rule 60(b)'s different substantive standard. Instead, the most straightforward reading of the provision is that it outlines first a substantive standard for the Court to apply—"good cause"—and then a procedure for meeting it—"shown pursuant to the Federal Rules of Civil Procedure."  See Consent Decree ¶ 7.  And this plain-meaning understanding of the provision has the added virtues of crediting the specific over the general and avoiding surplusage.  The specific "good cause" standard can only be read as a substantive standard; supplanting it with a borrowed standard from elsewhere would leave it no work to do.  Meanwhile, applying the "good cause" standard leaves the broad reference to the Federal Rules with at least some potential work to do.  No specific rule is invoked.  So the reference could, for instance, clarify that the Federal Rules' default deadlines will govern modification motions and oppositions thereto, or it could signify that the parties intended to incorporate the principles informing "good cause" where it is used in the Federal Rules (e.g., in Rules 55(c) or 16(b)(4)).  This reading sensibly (if imperfectly) resolves the ambiguity in the consent decree.

The plaintiffs' best case to the contrary is Sierra Club v. Meiberg, 296 F.3d 1021 (11th Cir. 2002).  In that case, the Eleventh Circuit concluded that a consent decree deferred to Rule 60(b) where it provided that "nothing in the decree 'shall be construed to limit the equitable powers of

---

[3] See also, e.g., Keegel v. Key West & Caribbean Trading Co., 627 F.2d 372, 375 n.5 (D.C. Cir. 1980) (explaining that "good cause shown" is "a standard calling for an exercise of the court's discretion, and thus a less rigid and more liberal attitude than Rule 60(b) allows"); Flanagan v. Islamic Republic of Iran, 190 F. Supp. 3d 138, 149–50 (D.D.C. 2016) (contrasting Rule 60(b)'s "more stringent requirements" with the "more lenient . . . 'good cause' standard"); SEIU Nat'l Indus. Pension Fund v. Hamilton Park Health Care Ctr., 304 F.R.D. 65, 70 (D.D.C. 2014) (similar); Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co., 288 F. Supp. 2d 22, 26 (D.D.C. 2003) (similar).

the Court to modify [its] terms upon a showing of good cause by any party.'" Id. at 1032–33. The court viewed that provision as "boilerplate" language that did not "giv[e] the district court any more power to modify the decree than it already had under Rule 60(b)(5)," and thus applied that rule's standard. Id. at 1033.

Meiberg, of course, does not bind this Court. But it is distinguishable in any event. That consent decree refused to "limit" the court's preexisting powers. This one grants the Court authority independent of any preexisting power, providing that its deadlines "may be extended . . . by the Court." Consent Decree ¶ 7. Its language looks a lot more like a bargained-for exchange than boilerplate recitation of preexisting authority outlined by the Federal Rules. That bargain permits extensions upon "good cause shown" rather than the "high[er] hurdle" erected by Rule 60(b). See Meiberg, 296 F.3d at 1033–34.

## II.     The EPA has shown good cause.

The EPA has shown good cause, and the plaintiffs don't argue otherwise. The good cause standard calls for "an exercise of the court's discretion," Keegel, 627 F.2d at 375 n.5, in ascertaining whether the EPA provides a "legally sufficient reason," Cause (2), Black's Law Dictionary (12th ed. 2024). In the Court's view, the EPA's proffered justifications together meet this standard.

First consider the arrival of a new presidential administration. Although perhaps not sufficient on its own to justify an extension, the administrative transition is a legitimate consideration. New officials need time to get up to speed with complicated regulatory schemes, coordinate across branches, and implement priorities. See, e.g., Decl. of John Mooney [ECF No. 62-4] ¶ 15.

8

Second, and on top of that general consideration, the EPA gives a litany of state-specific reasons it requires extensions on certain state plans. For the most part, these strike the Court as reasonable. Public comment periods, some initiated recently due to delays attributable more to the states than to the EPA, produced voluminous comments to which the EPA must respond with care. Take Florida as an example. Florida's original plan was more than 5,500 pages long; Florida then supplemented it with additional material in June 2024, October 2024, and mid-December 2024. See Díaz Decl. ¶ 10. That left the EPA issuing its proposed rulemaking in late December 2024, with the comment period closing on January 27, 2025. Id. ¶ 11. The comment period produced thousands of pages of public comments and supporting documentation, including comments that require coordination across multiple regional EPA offices. Id. ¶ 12. The EPA thus requests an additional 60 days from its original March 31, 2025, deadline to reach a final determination on Florida's plan. Id. ¶ 14. Other states follow a similar pattern. And the EPA does not appear to have been dragging its feet in its attempts to meet its deadlines in any of these states; to the contrary, it seems to be making a good faith effort to do so, as illustrated by its uninterrupted compliance thus far.

Against this need for a more careful and deliberative process, the plaintiffs protest that extensions are unwarranted because they will cause harm in the form of additional pollution produced while the revised plans remain in the making (and thus not enforceable). Opp'n at 1–2. This is a fair concern. But note that these are plan revisions; it is not as if air pollution is going entirely unregulated in the interim. Indeed, some (though not all) of the harms the plaintiffs assert in this case are procedural harms—for instance to their ability to comment on and sue over the EPA's treatment of state plans. See Mem. Supp. Mot. Summ. J. at 8. These are important interests, but they will be vindicated in due course and their urgency is limited. Besides, it is not clear to

9

the Court that forcing the EPA to ram regulations through without treating public comments and other considerations with the care they deserve will benefit anybody. Accordingly, brief two-to-three-month extensions of the status quo are unlikely to cause much damage—and indeed, in the circumstances here, denying the extensions might harm the plaintiffs' interests more than it helps them.

The Court acknowledges the plaintiffs' frustration. Even before the consent decree, EPA's compliance was "already long overdue." Id. at 17. By now, it is even more overdue. Furthermore, the Court takes the point that some of the new administration's struggles may be self-inflicted. See Opp'n at 14–15. The EPA has a duty to meet its legal obligations; it cannot duck them by shedding staff and then declaring itself impossibly shorthanded. Finally, the Court notes that the good cause standard is not without bite, and the Court will not look favorably upon serial extension requests.

But the EPA has complied with its obligations thus far, and it appears to have made a strong effort to meet its upcoming ones as well. The Court is reluctant to mandate a rush job on these important regulations. For now, the EPA has shown good cause for the short extensions it requests.

## Conclusion

For the above reasons, the Court **GRANTS** the EPA's motion for extension of time to comply with certain of the consent decree's deadlines. As a result, the consent decree is amended to reflect the following extensions:

- The EPA must sign the Florida Regional Haze Plan revision by May 30, 2025;
- The EPA must sign the West Virginia Regional Haze Plan revision by June 28, 2025;
- The EPA must sign the Ohio Regional Haze Plan revision by June 28, 2025;
- The EPA must sign the Idaho Regional Haze Plan by August 28, 2025;
- The EPA must sign the Michigan Regional Haze Plan by August 28, 2025;

- The EPA must sign the Texas Regional Haze Plan by August 28, 2025; and

- The EPA must sign the California Regional Haze Plan by August 28, 2025.

**SO ORDERED.**

/s/<br>JOHN D. BATES<br>United States District Judge

Dated: March 20, 2025