UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>    Defendants. | Civil Action No. 23-1744 (JDB) |

**MEMORANDUM OPINION**

The Sierra Club, the National Parks Conservation Association, and the Environmental Integrity Project (collectively "Plaintiffs") brought this action to compel the United States Environmental Protection Agency ("EPA") and its Administrator, Lee Zeldin[1] (collectively "Defendants"), to take certain required actions under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq. Fortunately, the parties' negotiations bore fruit and resulted in a consent decree.

Now, the Plaintiffs move to recover $173,217 in attorney's fees and costs. Upon careful consideration, the Court will grant the Plaintiffs' motion in part and award them $99,343.43 in total—$98,841.43 in attorney's fees and $502 in costs.

**BACKGROUND**

The CAA aims to protect visibility in "class I Federal areas . . . from manmade air pollution." 42 U.S.C. § 7491(a)(1).[2] Thus, it requires qualifying states periodically to submit State

---

[1] See Fed. R. Civ. P. 25(d).

[2] 156 national parks and wilderness areas comprise "Class I Federal areas." United States Environmental Protection Agency, Regional Haze Program, (Mar. 12, 2025), https://www.epa.gov/visibility/regional-haze-program. Throughout this Opinion, the Court takes judicial notice of government websites. See, e.g., Santos v. Collins, Civ. A. No. 24-1759 (JDB), 2025 WL 1905596, at *1 n.2 (D.D.C. July 10, 2025).

1

Implementation Plans ("SIPs") to the EPA to address visibility impairment in these areas. See id. § 7491(b)(2); 40 C.F.R. § 51.308. Within sixty days of a state's SIP submission, but no later than six months after a state's SIP submission deadline, the EPA must determine whether the submission is "complete" under criteria established by the CAA and relevant regulations. See 42 U.S.C. § 7410(k)(1); 40 C.F.R. pt. 51, app. V. If the EPA does not make a timely finding of completeness, the plan is deemed complete by operation of law. 42 U.S.C. § 7410(k)(1)(B). Within twelve months of a SIP being declared "complete," the EPA must approve (wholly or in part), conditionally approve, or disapprove the submission.[3] Id. § 7410(k)(2)–(4).

The Plaintiffs filed their initial complaint in June 2023, alleging that the EPA had failed to take final action within twelve months of the completion of SIP submissions from seven states.[4] See Compl. for Declaratory & Injunctive Relief [ECF No. 1] ("Initial Compl."). They amended their complaint in November 2023, expanding the list of states to thirty-four.[5] See Am. Compl. for Declaratory & Injunctive Relief [ECF No. 15] ("Am. Compl.").

Eventually, through a series of unopposed motions for extension, the Plaintiffs and Defendants negotiated a consent decree, see Consent Decree [ECF No. 53-1] ("CD"), which this Court approved in July 2024, see Order Approving Consent Decree [ECF No. 53]. In the decree, the parties established a schedule by which the Defendants agreed to take final action on all

---

[3] The Court will refer to these actions collectively as "final actions."

[4] Kansas, Massachusetts, Michigan, New York, Ohio, Texas, and Wisconsin.

[5] The additional 27 states are: Alaska, Arkansas, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Maryland, Montana, Nevada, New Hampshire, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Washington, West Virginia, and Wyoming.

completed SIP submissions still pending such action.[6]  See CD ¶ 3.  They also agreed that the Plaintiffs could "file a motion for costs of litigation (including attorney fees)."  Id. ¶ 13.

The Plaintiffs filed the instant fee motion in January 2025, requesting $181,977 in total.  Pls.' Mot. for Costs of Litigation, Including Att'ys' Fees [ECF No. 57] ("Fee Mot.") at 9.  In response to the Defendants' objections to some of the billed hours, see Defs.' Fee Resp. to Pls.' Mot. [ECF No. 59] ("Defs.' Resp.") at 9–10 & n.6, the Plaintiffs reduced their request to $173,217.  See Pls.' Reply Supp. Fee Mot. [ECF No. 63] ("Pls.' Reply") at 7.  The Defendants agree that the Plaintiffs are entitled to fees and costs, Defs.' Resp. at 1, but for "no more than $42,500."  Id. at 14.

## ANALYSIS

Under the CAA, this Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  42 U.S.C. § 7604(d).  Because the parties do not dispute that the Plaintiffs are entitled to fees, see Defs.' Resp. at 1, the Court considers only the fees' magnitude.[7]

The "basic formula" for calculating reasonable attorney's fees is to multiply "the number of hours reasonably expended in litigation by a reasonable hourly rate."  DL v. District of Columbia, 924 F.3d 585, 588 (D.C. Cir. 2019) (cleaned up).  The movant bears the burden of demonstrating the reasonableness of both the rates and hours.  See Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015).  And the opposing party can rebut the movant's claims "by equally specific

---

[6] The Plaintiffs dropped claims relating to two (Maryland and Massachusetts) out of the thirty-four states in the Amended Complaint, because the EPA had taken final actions on those states' SIPs before this Court approved the consent decree.  See CD at 4.

[7] The Defendants also do not challenge the reasonableness of the $502 in costs.

3

countervailing evidence." Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1326 (D.C. Cir. 1982). The Court will examine the rates and hours in turn.

**I.     Rates**

The parties disagree first about the hourly rates. See Pls.' Reply at 5. The Plaintiffs bear the burden of establishing the reasonableness of their requested rates through a three-part framework: "(1) the attorneys' billing practices; (2) the attorneys' skill, experience, and reputation; (3) and the prevailing market rates in the relevant community." Salazar ex rel. Salazar v. District of Columbia, 809 F.3d 58, 61–62 (D.C. Cir. 2015) (cleaned up). The Defendants challenge only the third prong, specifically what fee matrix among those in existing case law to apply. Defs.' Resp. at 4.

   a. Fitzpatrick Matrix

"A court calculating a prevailing market rate allows fee applicants to submit attorneys' fee matrices as one type of evidence." Salazar, 809 F.3d at 62. These matrices suggest hourly rates based on years of attorney experience. See id. Here, the Plaintiffs urge the Court to apply the LSI Laffey Matrix, while the Defendants advocate for the newer and less generous Fitzpatrick Matrix.[8] See Defs.' Resp. at 4.

To determine the applicable rates, the Court must walk through a "burden-shifting framework," examining first the Plaintiffs' evidence and then weighing it against any countervailing evidence from the Defendants. See DL, 924 F.3d at 588–89. Given that fee matrices are "somewhat crude, the matrix's proponent usually cannot stop there"; the Plaintiffs must provide further support for the matrix's rates, such as "surveys to update the matrix; affidavits

---

[8] Both matrices are "meant to capture the market rates for complex federal litigation in the District [of Columbia]." J.T. v. District of Columbia, 652 F. Supp. 3d 11, 29–30 (D.D.C. 2023) (emphasis added). The parties do not meaningfully brief complexity, and the Court need not resolve whether this case is complex because the Defendants assume complexity by advocating for the Fitzpatrick Matrix. See id. at 30.

4

reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." Id. at 589 (internal quotation marks omitted).

Here, the Plaintiffs offer: (1) an expert report of William H. Jeffress, Jr.[9]; (2) an affidavit of Dr. Michael Kavanaugh[10]; and (3) prior decisions from judges in this District and the D.C. Circuit that have concluded the LSI Laffey Matrix is reasonable.[11] But these sources fail to meet the Plaintiffs' initial burden.

First, this Court is familiar with the Jeffress report, which concludes that rates in line with the LSI Laffey Matrix were reasonable for a non-CAA, complex personal injury suit. See Jeffress Report at 2–3; Feld v. Fireman's Fund Ins. Co., Civ. A. No. 12-1789 (JDB), 2020 WL 1140673, at *8 (D.D.C. Mar. 9, 2020). But the Plaintiffs merely attach the report here without meaningfully explaining why the rates for their CAA litigation should also align with the LSI Laffey Matrix. Second, the Kavanaugh affidavit was prepared in 2010 for a 42 U.S.C. § 1983 dispute, see Salazar v. District of Columbia, Civ. A. No. 93-452 (GK) (D.D.C.), and argues for the superiority of the LSI Laffey Matrix over the less generous USAO Laffey Matrix. See Kavanaugh Aff. It's unclear how that discussion aids the Plaintiffs' case for the superiority of the LSI Laffey Matrix over the Fitzpatrick Matrix in this CAA case. Cf. Elec. Priv. Info. Ctr. v. DEA, 266 F. Supp. 3d 162, 171 (discounting a 2013 Kavanaugh declaration defending LSI Laffey Matrix against competing matrix as outdated evidence due to change in competing matrix's methodology).

---

[9] Pls.' Reply Ex. A, Expert Report of William H. Jeffress, Jr. [ECF No 63-1] ("Jeffress Report").

[10] Pls.' Reply Ex. B, Aff. of Dr. Michael Kavanaugh. [ECF No 63-1] ("Kavanaugh Aff.").

[11] Fee Mot. at 5–7; Pls.' Reply at 2–3.

Lastly, the prior judicial decisions don't help the Plaintiffs, either. The Plaintiffs cite multiple cases applying the LSI Laffey Matrix, but none involved the CAA. Cf. Eley, 793 F.3d at 104 (pointing out that none of the four cases cited by fee applicant for using the LSI Laffey Matrix concerned the statute at issue). And the one CAA fee-shifting case they invoke didn't apply the LSI Laffey Matrix. See Sierra Club v. McCarthy, 235 F. Supp. 3d 63 (D.D.C. 2017) (applying the USAO Matrix[12] where neither party contested rates).

In short, the Plaintiffs fail their burden because they merely suggest a matrix without providing sufficient evidence demonstrating that their "requested rates are in line with those prevailing in the community for similar services"—here, CAA litigation. See Eley, 793 F.3d at 104 (emphasis in original) (internal quotation marks omitted).

---

[12] Astute readers of the record may notice that the Plaintiffs claim Sierra Club applied the "Laffey Matrix published by the United States Attorney's Office for the District of Columbia [USAO-DC]," Fee Mot. at 5–6, or simply the "Laffey Matrix," Pls. Reply at 2. These characterizations are imprecise and/or inaccurate.

It is imprecise to call any modern fee matrix the "Laffey Matrix." The actual Laffey Matrix debuted in 1983 in its namesake case. See Laffey v. Nw. Airlines, Inc., 572 F. Supp. 354, 371 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), overruled in part, Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516 (D.C. Cir. 1988) (en banc). Since then, courts have used two competing iterations of the Laffey Matrix to account for inflation: (1) LSI Laffey Matrix and (2) USAO Laffey Matrix. See DL, 924 F.3d at 589–90. This means there is no single "Laffey Matrix" in use. The Plaintiffs seek to apply the LSI Laffey Matrix, which is the more generous offspring. See Smith v. District of Columbia, 466 F. Supp. 2d 151, 156 (D.D.C. 2006). Citing to a case applying a distinct and less generous fee matrix does not help the Plaintiffs' cause.

It's also inaccurate to label the matrix used in Sierra Club as a Laffey Matrix of any kind. The Sierra Club court incorrectly characterized the rates it applied as being based on the "Laffey Matrix published by the [USAO-DC]." 235 F. Supp. 3d at 67. But by 2015, the USAO-DC had scrapped its USAO Laffey Matrix and created a new fee matrix wholly untethered to the original Laffey Matrix. See DL, 924 F.3d at 590. A close reading of Sierra Club's record reveals that the plaintiff actually asked for, and the Court subsequently affirmed, rates based on this new "USAO Matrix," see Mot. Att'y Fees [ECF No. 15, Civ. A. No. 15-2264] at 9 & n.4 (requesting hourly rates of $386 and $325 based on the "revised" USAO Matrix); Sierra Club, 235 F. Supp. 3d at 67 (affirming same hourly rates), which is also thriftier than the LSI Laffey Matrix, see Klayman v. Judicial Watch, Inc., Civ. A. No. 06-670 (GMH), 2022 WL 22263805, at *20 (D.D.C. Oct. 25, 2022). The Defendants also conflate the "USAO Matrix" and the "USAO Laffey Matrix." See Defs.' Resp. at 5. See generally Schiff v. District of Columbia, Civ. A. No. 18-1382 (ZMF), 2021 WL 4059469, at *3 (D.D.C. Sep. 7, 2021) (tracing the labyrinthine history of the "three-headed hydra" of pre-Fitzpatrick matrices). The D.C. Circuit subsequently rejected the legitimacy of the USAO Matrix for complex federal litigation in the District, see DL, 924 F.3d at 592–93, which spurred the creation of the Fitzpatrick Matrix. See J.T., 652 F. Supp. 3d at 15–16.

6

On the other hand, the Defendants amply demonstrate the Fitzpatrick Matrix's rates are reasonable. Since the matrix's debut in November 2021, judges in this District have almost uniformly come to view it as "a superior measure of the prevailing market rate for complex federal litigation in the District as compared to the LSI Laffey Matrix." J.T. v. District of Columbia, 652 F. Supp. 3d 11, 32 (D.D.C. 2023) (Individuals with Disabilities Education Act ("IDEA") litigation); see also Alavi v. Bennett, Civ. A. No. 15-2146 (RBW), 2024 WL 505604, at *13 (D.D.C. Dec. 10, 2024) (Title VII litigation); Brackett v. Mayorkas, Civ. A. No. 17-988 (JEB), 2023 WL 5094872, at *4 (D.D.C. Aug. 9, 2023) (Rehabilitation Act litigation). Given this growing consensus, the Court sees no reason to not apply the Fitzpatrick Matrix rates in CAA litigation, especially considering that "fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike."[13] Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 758 n.2 (1989) (internal quotation marks omitted). What's more, at least one judge in this District has lamented his inability to deploy the Fitzpatrick Matrix where a statute bound him to the LSI Laffey Matrix.[14]

The Plaintiffs offer two novel criticisms of the Fitzpatrick Matrix, see Pls.' Reply at 3–4, neither of which convinces the Court. First, they contend that the Fitzpatrick Matrix fails the "basic test of showing prevailing market rates for the same type of litigation in the District of Columbia legal market," id., because an explanatory note to the Matrix defines a reasonable fee as

---

[13] Compare 42 U.S.C. § 7604(d) ("The court . . . may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.") (CAA), with 20 U.S.C. § 1415(i)(3)(B)(i) ("[T]he court, in its discretion, may award reasonable attorneys' fees as part of the costs.") (IDEA), and 42 U.S.C. § 2000e-5(k) ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs.") (Title VII), and 29 U.S.C. § 794a(b)(1) ("[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.") (Rehabilitation Act).

[14] See Cabrera v. Mogoo, Inc., Civ. A. No. 22-1816 (MJS), 2025 WL 1341520, at *5 (D.D.C. May 8, 2025) ("Judges in this District are increasingly using the Fitzpatrick Matrix in lieu of the [LSI] Laffey Matrix as a more faithful barometer . . . . Given this shifting landscape, it may be worthwhile for the D.C. Council to revisit the governing statutory scheme to consider substituting the Fitzpatrick Matrix for the [LSI] Laffey Matrix to compute fee awards. But until that occurs, the Court is bound by the statute as it stands.").

what "is sufficient to attract an adequate supply of capable counsel for meritorious cases." USAO-DC, Civ. Div., The Fitzpatrick Matrix, Explanatory Note 2, https://www.justice.gov/usao-dc/media/1395096/dl?inline (citing Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010)). The Plaintiffs claim this definition "has nothing to do with" the proper focus on whether the requested rates are "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Pls.' Reply at 4 (quoting DL, 924 F.3d at 588). But this argument fails to grapple with the methodology behind the Fitzpatrick Matrix: eighty-six cases with attorney's fee motions filed in this Court ("the community") for complex federal litigation ("similar services") anchor the Matrix. The Fitzpatrick Matrix, Explanatory Notes 1, 5–13. A few words plucked out of context do not disturb the reality that the Fitzpatrick Matrix shows the market rates for complex litigation in the District.

      Second, the Plaintiffs point out that the Fitzpatrick Matrix draws from fee motions rather than invoices to clients. See Pls.' Reply at 4. This methodology, they argue, fails to "show the rates that for-profit attorneys actually charged their clients" because attorneys have incentive to submit rates derived from less generous matrices to avoid "prolonged litigation over a fee award." Id. (emphasis added). This is a weak objection at best. To begin, the Plaintiffs proffer no evidence to support this assertion. Moreover, the Fitzpatrick Matrix's base data excluded cases that "involved rates explicitly or implicitly based on an existing fee matrix." The Fitzpatrick Matrix, Explanatory Note 5. If the Plaintiffs are right that some attorneys have submitted fee motions with low-balled amounts based on less generous matrices, the Fitzpatrick Matrix would not have considered those motions.

      Accordingly, the Court will apply the Fitzpatrick Matrix. That undertaking is straightforward. The Plaintiffs' lead counsel, Charles McPhedran, graduated from law school in

1990. Fee Mot. at 4. His timesheets range from June 2023 to May 2024, Fee Mot. Ex. A-2, McPhedran Timesheets [ECF No 57-1] ("McPhedran Timesheets") at 9–13, meaning he worked on the case 33–34 years after graduation.[15] Thus, the appropriate Fitzpatrick Matrix rates for Mr. McPhedran's work done in 2023 and 2024 are $804 per hour and $862 per hour, respectively. See The Fitzpatrick Matrix. The Plaintiffs' co-counsel, Joshua Smith, graduated from law school in 2006. Fee Mot. at 5. His timesheets range from March 2023 to March 2024, Fee Mot. Ex. B-2, Smith Timesheets [ECF No 57-1] ("Smith Timesheets") at 21–22, meaning he worked on the case 17–18 years after graduation. The appropriate Fitzpatrick Matrix rates for Mr. Smith's work done in 2023 and 2024 are therefore $707 per hour and $768 per hour, respectively. See The Fitzpatrick Matrix.

## II.  Hours

Having established the rates, the Court turns to the parties' second disagreement: the reasonableness of the Plaintiffs' billed hours. "Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." Concerned Veterans, 675 F.2d at 1327. These records "must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970 (D.C. Cir. 2004) (internal quotation marks omitted). The Defendants then bear the burden of presenting "detailed and specific reasons why the applicant's request should be reduced or denied." Beck v. Test Masters Educ. Serv., Inc., 73 F. Supp. 3d 12, 17 (D.D.C. 2014) (citations omitted). The Court will "consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive." Donnell v.

---

[15] The Fitzpatrick Matrix measures experience by calendar year: any legal work performed in the year of law school graduation counts as zero years after graduation. See The Fitzpatrick Matrix, Explanatory Note 4.

9

United States, 682 F.2d 240, 250 (D.C. Cir. 1982). In modifying fees, the Court has discretion to "identify specific hours that should be eliminated or simply reduce the award." Hensley v. Eckerhart, 461 U.S. 424, 436–37 (1983) (cleaned up). Regardless of the approach it takes, the Court's "essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 838 (2011).

The Plaintiffs apply a voluntary 10 percent discount on their billed hours to "account for any inefficiency remaining after the exercise of billing judgment." Fee Mot. at 9. But the Defendants are dissatisfied with the hour reductions, raising several objections and seeking further reductions. See Defs.' Resp. at 8–13. Because some of these objections have merit, the Court will further reduce the Plaintiffs' hours.

    a. Block-billing

The Defendants first ask the Court to reduce the Plaintiffs' fee request because the Plaintiffs use "block-billed time entries." Id. at 9. Block-billing is the disfavored practice of "lumping multiple tasks into a single time entry, which can make it impossible to evaluate their reasonableness." Tridico v. District of Columbia, 235 F. Supp. 3d 100, 109 (D.D.C. 2017) (cleaned up). Judges in this District have often reduced fee awards for block-billing. See id. (collecting cases). But the Court may decline to levy additional discounts where plaintiffs offer voluntary reductions. See Segar v. Garland, Civ. A. No. 77-81 (EGS), 2024 WL 4332615, at *8 (D.D.C. Sept. 27, 2024) (finding 10 percent voluntary reduction adequate to counteract block-billing); cf. Driscoll v. George Washington Univ., 55 F. Supp. 3d 106, 116 (D.D.C. 2014) (finding 5 percent voluntary reduction adequate to counteract inadequately documented billing).

Here, the Plaintiffs' 10 percent voluntary fee reduction is sufficient to account for block-billing. While most of the Plaintiffs' time entries are to some extent block-billed,[16] the Plaintiffs were generally careful to limit entries to small time increments. Out of 142 total time entries, 92 were for less than ninety minutes. Only two exceeded five hours, and these were less than seven hours each.[17] Thus, the Plaintiffs never logged "entire days on a variety of vague tasks with a single time entry." See Segar, 2024 WL 4332615, at *8.

But a reduction for block-billing does not necessarily account for all inadequacies in a fee request. See, e.g., Apprio, Inc. v. Zaccari, Civ. A. No. 18-2180 (JDB), 2025 WL 1905643, at *10 (D.D.C. July 10, 2025) (reducing fee by 10 percent for block-billing and another 30 percent for excessive hours). The Court will therefore apply the 10 percent voluntary reduction across all of the Plaintiffs' hours for block-billing and also layer on additional reductions discussed below.

b. Third-party claims and the Plaintiffs' motion for summary judgment

Next, the Defendants ask for reductions for "work that was not required to resolve [the] Plaintiffs' claims against [the] Defendants." Defs.' Resp. at 9. In particular, the Defendants point to time the Plaintiffs spent (1) responding to plaintiff-intervenor PacifiCorp's motion for intervention and motion to stay and (2) filing a motion for summary judgment and responding to PacifiCorp's opposition to the motion. See id. at 9–10 & n.6.

In December 2023, the Plaintiffs moved for summary judgment, Mot. for Summ. J. [ECF No. 22], amid settlement talks, see Defs.' Unopposed Mot. Extension to Respond to Mot. Summ. J. [ECF No. 23] ("First Extension to Respond to Mot. Summ. J.") at 1 n.1, and before the

---

[16] Virtually all of Mr. McPhedran's time entries are block-billed. See McPhedran Timesheets at 9–13. About half of Mr. Smith's time entries are block-billed and to a lesser degree than Mr. McPhedran's. See Smith Timesheets at 21–22.

[17] See McPhedran Timesheets at 9, 11 (billing 6.8 hours on June 14, 2023, and 6.5 hours on Jan. 16, 2024, for various block-billed tasks).

11

Defendants filed their answer, Answer to Am. Compl. [ECF No. 28]. Only plaintiff-intervenor PacifiCorp[18] opposed the motion for summary judgment. See PacifiCorp's Mem. Partial Opp'n to Summ. J. [ECF No. 31] ("PC Opp'n."). The Plaintiffs replied to the opposition. Pls.' Reply to PacifiCorp's Mem. Partial Opp'n [ECF No. 33]. PacifiCorp also moved to stay the proceedings as relevant to Utah and Wyoming. PacifiCorp's Proposed Mot. to Stay [ECF No. 30]. Both the Plaintiffs and Defendants opposed this motion. Pls.' Resp. in Opp'n to Mot. to Stay [ECF No. 35]; Defs.' Resp. to Mot. to Stay [ECF No. 36].

In their fee motion, the Plaintiffs initially claimed to have voluntarily excluded all "hours spent reviewing and responding to motions to intervene,[19] a motion to stay, [and] an opposition to summary judgment . . . filed by intervenors in this case." Fee Mot. at 8. But after the Defendants correctly pointed out that the Plaintiffs did not remove all such hours, see Defs.' Resp. at 9–10 & n.6, the Plaintiffs voluntarily removed 9.7 hours, see Pls.' Reply at 7. However, the 9.7 hours are only a subset of the leftover hours that the Defendants identified and that the Plaintiffs originally promised to exclude. Specifically, the Plaintiffs did not eliminate all time spent responding to PacifiCorp's opposition to the Plaintiffs' summary judgment motion.[20]

The Court will exclude all remaining hours the Plaintiffs spent responding to PacifiCorp's filings. To start, the Plaintiffs promised to remove them. See Fee Mot. at 8. But even without that promise, the Court would exclude the hours. The Plaintiffs claim that Environmental Defense

---

[18] PacifiCorp is a regional utility company with extensive operations in Utah and Wyoming, two states whose SIP submissions are part of the claims in the amended complaint. See PacifiCorp's Mem. Partial Opp'n to Summ. J. [ECF No. 31] ("PC Opp'n.") at 5–6.

[19] Aside from plaintiff-intervenor PacifiCorp, North Dakota and Nevada moved to intervene on behalf of the Defendants. See North Dakota's Mot. to Intervene [ECF No. 18]; Nevada's Mot. to Intervene [ECF No. 27]. The Plaintiffs voluntarily removed hours regarding Nevada's motion, Pls. Reply at 7 n.5 (0.9 hours on Jan. 9, 2024), and did not log hours regarding North Dakota's motion.

[20] See McPhedran Timesheets at 11 (2.5 hours on Jan. 12, 2024; 3.0 hours on Jan. 14, 2024; 1.5 hours on Jan. 15, 2024; 6.5 hours on Jan. 16, 2024).

Fund, Inc. v. EPA ("EDF"), 672 F.2d 42 (D.C. Cir. 1982), confirms that "courts have found similar attorney hours compensable." Fee Mot. at 8. However, it shows no such thing. In EDF, the D.C. Circuit rejected the defendant EPA's request to remove hours that the plaintiff had logged litigating against third-party intervenors. See 672 F.2d at 55. But this was because the positions of the EPA and the intervenors were "closely aligned." Id. at 56 n.8. It was therefore reasonable to require the EPA to pay the plaintiff for time spent working against the intervenors. Here, PacifiCorp did not intervene "in the defense of" the EPA, see id. at 56—indeed, it intervened as a plaintiff. It sought only to continue its own litigation against the EPA in its preferred venues. See PC Opp'n. at 1–2.

The more relevant precedent, offered by the Defendants, is Judicial Watch, Inc. v. Department of Commerce, 470 F.3d 363 (D.C. Cir. 2006). There, the D.C. Circuit denied fee recovery to a plaintiff for work done against third parties when (1) litigation disputes between the plaintiff and third parties were not initiated or pursued by the defendant; (2) the third parties were not represented by the defendant; and (3) the defendant had neither authority nor control over the third parties. See id. at 374. All three points are true here as well.

Beyond the 9.7 hours already deducted by the Plaintiffs, the Court identifies approximately 13.5 hours the Plaintiffs spent replying to PacifiCorp's opposition to summary judgment. The Court will completely remove 5.5 of these hours spent entirely on the reply.[21] The remaining 8 hours are block-billed with tasks either not related to the reply or inadequately described.[22] The Plaintiffs' voluntary 10 percent reduction accounts for the existence of block-billing but does not remove the ineligible reply time embedded in the block-billed entries. Given that precise excision

---

[21] See McPhedran Timesheets at 11 (2.5 hours on Jan. 12, 2024; 3.0 hours on Jan. 14, 2024). While these entries are block-billed, they are entirely about the Plaintiffs' reply to PacifiCorp's opposition to summary judgment.

[22] See id. (1.5 hours on Jan. 15, 2024; 6.5 hours on Jan. 16, 2024).

13

is impossible, the Court will further reduce these entries by 40 percent. Cf. Tridico, 235 F. Supp. 3d at 110 (halving subset of requested fee associated with overbilled travel time). That totals to an 8.7-hour reduction.

The Defendants also challenge hours the Plaintiffs spent working on their summary judgment motion, which the Plaintiffs filed in the midst of settlement negotiations in December 2023. See Defs.' Resp. at 10. The Plaintiffs say that they filed the motion "in light of [the] EPA's sluggish efforts to respond to the complaint and settlement proposals" and note that the parties reached the consent decree only after the Plaintiffs filed the motion. Fee Mot. at 8; Pls.' Reply at 6. The Defendants counter that the Plaintiffs present no evidence that the motion affected the underlying case's ultimate disposition. See Defs.' Resp. at 10.

The Court agrees with the Defendants and will remove from the fee calculation the time the Plaintiffs spent working on the summary judgment motion. "[T]he inquiry before the Court is whether the hours expended by Plaintiff's counsel on [the summary judgment motion] were necessary and reasonable." Sierra Club, 235 F. Supp. 3d at 68. As in Sierra Club, the answer here is no. Consider the similarities to that case: (1) counsel worked on the motion before "[the] EPA was required to answer"; (2) the EPA gave no indication that it would "aggressively litigate" the lawsuit; and (3) the Plaintiffs would have had "ample opportunity" to pursue a dispositive motion after the EPA filed its Answer. Id.

The only relevant distinction from Sierra Club is that here the Plaintiffs actually filed their summary judgment motion. Even so, the Plaintiffs do not establish why the motion was "necessary [or] reasonable." Id. Before and after the motion, the Defendants asked for, and the Plaintiffs never opposed, a series of extensions to negotiate for the consent decree.[23] If, as the Plaintiffs

---

[23] See, e.g., Defs.' Unopposed Mot. Extension to Answer [ECF No. 12]; First Extension to Respond to Mot. Summ. J.; Final Defs.' Unopposed Mot. Extension to Respond to Mot. Summ. J. [ECF No. 49].

14

claim, the summary judgment motion was necessary to light a fire under the "sluggish" Defendants, Fee Mot. at 8, it's hard to see why the Plaintiffs never opposed any of the extension requests. And even if there was an explanation, the Plaintiffs have not provided it to the Court.

The Court identifies up to 49.7 hours billed for the summary judgment motion. Of these, the Court will completely remove 14.4 hours spent solely on the motion.[24] The remaining time is inextricably interspersed with unrelated tasks in 35.3 hours of block-billed entries.[25] Because the Court is unable to remove that time surgically, it will instead apply an additional 40 percent deduction on the 35.3 hours. Cf. Tridico, 235 F. Supp. 3d at 110 (halving subset of requested fee associated with overbilled travel time). This results in a total 28.52-hour reduction for work on the summary judgment motion.

   c. Fee agreements

The Defendants assert that "[t]he government should not have to pay for administrative matters relating to the formal relationship" between the Plaintiffs and their attorneys, including fee agreements. Role Models, 353 F.3d at 973; see also Miller v. Holzmann, 575 F. Supp. 2d 2, 26 n.40 (D.D.C. 2008). The Court agrees.[26] Mr. McPhedran recorded fee discussions with the

---

[24] See McPhedran Timesheets at 10 (1.3 hours on Sep. 5, 2023; 1.5 hours on Nov. 18, 2023; 1.3 hours on Nov. 21, 2023; 2.0 hours on Nov. 29, 2023; 1.4 hours on Dec. 6, 2023); Smith Timesheets at 21 (0.5 hours on Dec. 1, 2023; 1.8 hours on Dec. 8, 2023; 1.8 hours on Dec. 19, 2023; 0.3 hours on Dec. 20, 2023; 2.5 hours on Dec. 20, 2023).

[25] See McPhedran Timesheets at 9–11 (1.5 hours on Aug. 17, 2023; 2.0 hours on Aug. 31, 2023; 1.2 hours on Oct. 5, 2023; 1.5 hours on Oct. 11, 2023; 4.0 hours on Nov. 15, 2023; 3.0 hours on Nov. 16, 2023; 1.2 hours on Nov. 20, 2023; 2.7 hours on Nov. 22, 2023; 1.0 hours on Nov. 30, 2023; 3.0 hours on Dec. 7, 2023; 3.4 hours on Dec. 8, 2023; 3.0 hours on Dec. 19, 2023); Smith Timesheets at 21 (0.5 hours on June 28, 2023; 0.5 hours on Oct. 3, 2023; 4.5 hours on Nov. 22, 2023; 1.6 hours on Dec. 12, 2023; 0.5 hours on Dec. 22, 2023; 0.2 hours on Dec. 29, 2023).

[26] The Court is aware of cases allowing the plaintiff's counsel to bill for time spent on retainer agreements. See Czarniewy v. District of Columbia, Civ. A. No. 02-1496 (HHK), 2005 WL 692081, *4 (D.D.C. Mar. 25, 2005); Bailey v. District of Columbia, 839 F. Supp. 888, 891 (D.D.C. 1993). But both were IDEA cases, whose counsel were "operating either as solo practitioners or in small firms" who lacked "the manpower of a major law firm." Id. On the other hand, Earthjustice has fifteen offices and employs "200+ full-time lawyers," including Mr. McPhedran. About Earthjustice, EARTHJUSTICE, https://earthjustice.org/about (last visited July 22, 2025). The Court takes judicial notice of background information found on the website of the Plaintiffs' counsel. Cf. Mundo Verde Pub. Charter Sch. v. Solokov, 315 F. Supp. 3d 374, 381 n.3 (D.D.C. 2018) ("The court may take judicial notice of representations made

Plaintiffs in a heavily block-billed 6.8-hour entry from June 14, 2023. See McPhedran Timesheets at 9. Unable to discern exactly how much of the 6.8 hours were spent on the retainer, the Court will discount that entry by 40 percent for a 2.72-hour reduction.

### d. Excessive time on complaints

Next, the Defendants take issue with what they believe was excessive time spent on both complaints. See Defs.' Resp. at 11. But the Court is not convinced.

First, the Court rejects the Defendants' objection to the (up to) 21.9 hours the Plaintiffs spent crafting the initial complaint.[27] The Defendants rely mainly on Sierra Club, which found 11.39 hours reasonable for two attorneys to prepare the complaint for a CAA case. See 235 F. Supp. 3d at 70. But the 21.9 hours here are block-billed, so it is unclear that the Plaintiffs spent more time on the initial complaint than the counsel did in Sierra Club. And even if the Plaintiffs spent more than 11.39 hours, Sierra Club did not establish an upper limit of reasonable hours. The Court does not find it necessary to reduce these hours further.

The Court concludes the same for the 14.1 largely block-billed hours spent on the amended complaint,[28] which the Defendants characterize as a simple, unchallenged update to the initial complaint. See Defs.' Resp. at 11. That may well be true when one considers only the words added. But adding in claims from twenty-seven additional states also requires research and coordination. Additionally, on account of block-billing, the Plaintiffs did not actually spend all of

---

on Plaintiff's website."); see also United States v. Burroughs, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016) (taking judicial notice of Google Maps). What's more, the Plaintiffs did not respond to the Defendants' objection about the time spent on the retainer.

[27] See McPhedran Timesheets at 9 (June 2, 2023; June 6, 2023; June 7, 2023; June 9, 2023; June 13, 2023; June 14, 2023; June 15, 2023); Smith Timesheets at 21 (June 7, 2023; June 13, 2023).

[28] See McPhedran Timesheets at 9–10 (Aug. 28, 2023; Aug. 31, 2023; Sept. 1, 2023; Oct. 11, 2023; Nov. 9, 2023; Nov. 10, 2023); Smith Timesheets at 21 (Oct. 26, 2023; Nov. 9, 2023; Nov. 10, 2023).

the 14.1 hours in question on the amended complaint, nor are they recovering for all that time. The Court again concludes no additional reductions are necessary.

e. Communications with unidentified individuals and inadequately described tasks

The Defendants also challenge the Plaintiffs' billing for (1) communications with unidentified individuals and (2) inadequately described tasks. See Defs.' Resp. at 11–12. The Court agrees with these objections.

First, the Court agrees that it is improper to compensate the Plaintiffs for communicating with individuals for whom the Court has "no other information about their identities or the substance of the communications." Defs.' Resp. at 12. In Role Models, the D.C. Circuit determined that "time spent dealing with individuals whose roles in the case are never explained" was "manifestly inadequate" for compensation. 353 F.3d at 971; see also Michigan v. EPA, 254 F.3d 1087, 1093–94 (D.C. Cir. 2001). Here, the Plaintiffs' counsel billed for communications with individuals such as "Navarro," "Baron," "Gilbert," "Zelaya," "Rachel K.," "WH," "RA," "KH," and "TM."[29] Mr. McPhedran recorded the majority of these communications. It is not clear to the Court who these individuals are or why the Plaintiffs should be able to bill for time corresponding with them.

The Defendants also ask for reductions on account of inadequately described tasks that are part of block-billed entries. See Defs.' Resp. at 12. The Court agrees. Mr. McPhedran's time entries have multiple instances of inadequately described tasks such as "Check prior e-mails," "Additional e-mails," "e-mail to clients," "e-mails," "p/c," "Review notes and prior e-mails," "call,"

---

[29] See, e.g., McPhedran Timesheets at 9–11 (June 15, 2023; Aug. 16, 2023; Jan. 17, 2024; Jan. 19, 2024; Feb. 28, 2024; Mar. 12, 2024); Smith Timesheets at 21 (June 8, 2023; June 9, 2023; Oct. 12, 2023).

17

and "legal research" without any more context.[30] "Such generic entries are inadequate to meet a fee applicant's heavy obligation to present well-documented claims." Role Models, 353 F.3d at 971 (internal quotation marks omitted); see also Michigan, 254 F.3d at 1095 (levying 10 percent deduction for inadequate descriptions).

In summary, the Court agrees with the Defendants that the Plaintiffs inappropriately billed for time corresponding with unknown individuals and inadequately described many of their billed tasks. The majority of these issues reside in block-billed entries, making targeted removals difficult. Because these issues appear predominantly in Mr. McPhedran's entries, the Court will additionally discount Mr. McPhedran's billed hours by 10 percent and Mr. Smith's by 5 percent on top of the voluntary 10 percent cut for block-billing, while excluding entries from the previous sections that the Court will remove completely or reduce by 40 percent. These reductions amount to 8.19 hours for Mr. McPhedran and 1.935 hours for Mr. Smith.

f. Other challenges

Lastly, the Defendants take issue with the Plaintiffs' billing for time spent on (1) researching the Defendants' "request to extend [their] deadline to answer" and (2) clerical activities such as "researching how to file documents using the court's ECF system." Defs.' Resp. at 13. The Defendants highlight two entries that amount to less than five hours of block-billed time. See McPhedran Timesheets at 9–10 (Aug. 28, 2023; Nov. 10, 2023).[31]

---

[30] See, e.g., McPhedran Timesheets at 9–11 (June 6, 2023; June 14, 2023; Oct. 20, 2023; Nov. 8, 2023; Nov. 20, 2023; Jan. 19, 2024; Feb. 28, 2024; May 1, 2024).

[31] Although the Defendants point to a Oct. 10, 2023, entry by Mr. McPhedran, Defs.' Resp. at 13, no such entry exists. Based on the timesheet descriptions, the Court assumes the Defendants challenge the Nov. 10, 2023, entry.

The Court declines to reduce the Plaintiffs' hours further based on small, "nit-picking" objections that the D.C. Circuit discourages.  See <u>Alfonso v. District of Columbia</u>, 464 F. Supp. 2d 1, 5 (D.D.C. 2006).  The Court concludes that the aforementioned reductions are adequate.

## **CONCLUSION**

In summary, the Court will award the Plaintiffs $99,343.43: this amount consists of $98,841.43 in attorney fees and $502 in costs.  A separate order shall issue to that effect.

/s/<br>
JOHN D. BATES<br>
United States District Judge

Dated: <u>July 25, 2025</u>